CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 15 2013

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| MARK E. CROY, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 3:12-cv-00034 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| BLUE RIDGE BREAD, INC., | ) By: Hon. Glen E. Conrad |
| d/b/a/ PANERA BREAD | ) Chief United States District Judge |
| | ) |
| Defendant. | ) |

Plaintiff Mark Croy brought this civil lawsuit against his former employer Blue Ridge Bread, Inc., d/b/a/ Panera Bread ("BRB"), alleging violations of the Americans with Disabilities Act of 1990 ("ADA"), the Employee Retirement Income Security Act of 1974 ("ERISA"), and the Family and Medical Leave Act of 1993 ("FMLA"). The defendant filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the court will grant in part and deny in part the motion.

I. **Background**

Mark Croy began working for BRB in June of 2006 as a café worker. He was promoted in 2008 to BRB's marketing department, and worked in various capacities until being terminated on April 13, 2011. In March of 2011, Croy was diagnosed as having HIV. He claims that he was fired because of his illness, in violation of federal law. The defendant claims that the termination was due to persistent issues with the plaintiff's job performance.

BRB recounts several specific instances where Croy was disciplined for poor job performance. Croy received a formal write-up on March 14, 2011 for failing to properly prepare for an in-store event. He received a second write up on May 21, 2009 for failing to update a

store's Facebook page in a timely fashion. He received a third write-up on December 28, 2009 for using an "inappropriate and unprofessional" tone in a phone call with his supervisors. BRB also submitted a number of affidavits from store managers stating that Croy repeatedly failed to properly submit Product Request Forms ("PRF"). PRFs are used by the cafés to capture information for large orders, and BRB policy requires the forms be provided to cafés at least two weeks prior to the date for pick up. The managers testified that Croy's failure to fill out the PRFs led to product shortages for their regular customers. Although one of his supervisors spoke with Croy about the importance of providing the stores with accurate PRFs, Croy did not receive a write-up for any of the mistakes involving PRFs during this time period.

Croy, on the other hand, characterizes his employment record up until early 2011 as mostly positive. Although he does not dispute specific incidents, he notes that his performance review for the year 2009 indicates he was performing at a "meets expectations" level. This is the only performance review in the record, but the plaintiff states that in early 2011, he was told that his performance for the year 2010 was "excellent," and that he would be getting a large bonus in the year 2011.

In late February of 2011, Croy began experiencing severe flu-like symptoms. He requested time off from work to see a doctor, which was granted. During the days that followed, Croy worked reduced hours each day. Instead of his normal 8:30 a.m. to 5:00 p.m. schedule, he was expected to be available only between 10:00 a.m. and 4:00 p.m. each day. Initially, BRB did not dock Croy's pay for the time off, nor did it demand he use his accrued leave time to account for the reduced hours.

On March 10, 2011, Croy visited an infectious disease specialist, who gave him a preliminary diagnosis of HIV. That same day, Croy sent a Facebook message to one of his

2

supervisors, Kelly Jackson, which stated "I went to an infectious diseases specialist today at 3pm. What I heard was not good. He said there were strong indication [sic] this was viral, as in HIV. Not %100 [sic], but we re-tested for that and some other fairly nasty cohorts. I go back on March 24 to get the results and gameplan [sic]." (Docket No. 14-2, 5.) Croy reports that in the days and weeks that followed, he had numerous phone conversations with Jackson and another of his supervisors, Laura Perpetua, in which they discussed his HIV diagnosis.

Croy returned to his regular schedule on March 14. That same day, Jackson requested that Croy obtain a doctor's note indicating that he was physically able to return to work full time. Croy has testified that, on March 17, he affirmatively told Jackson and Perpetua that his HIV diagnosis had been confirmed. That same day, he also requested that he be allowed to continue to work reduced hours. In a departure from BRB's earlier position, Croy was told that he needed to either return to work full time or begin using his accrued leave hours for any future missed time.

On March 21, Croy sent a text message to Jackson relaying that he was, "working in normal mode[,]" and then another message three days later which stated, "No conclusions. . . . I get [sic] note showing I can work anywhere at anytime . . . pick it up in morning will give to [Perpetua] . . . no news is good news?!" (Docket No. 14-2, 7.) On March 24, Croy applied for a disability insurance policy through BRB. On one of the enrollment forms, he checked "no" when asked whether "[w]ithin the past 7 years, you have been diagnosed as having, or being treated for . . . or tested positive for antibodies to HIV." (Docket No. 14-2, 13.) On March 25, Perpetua received a note from Croy's doctor, stating that he was able to return to work full time without any restrictions. The note did not contain any information regarding his medical

3

condition. On March 30, 2011, Plaintiff told Perpetua that he was "glad to work like a normal person."

As discussed below, the parties vigorously dispute whether these communications effectively conveyed the extent of Croy's condition to BRB. Croy states that he affirmatively told Perpetua and Jackson that he was HIV positive, while BRB contends that it was, at most, aware of the possibility of such a diagnosis.

Shortly after his return to a full day schedule, Croy failed to properly submit PRFs to several cafés. These incidents, each of which resulted in a formal write-up, occurred on March 29, April 4, and April 8. When Croy learned about the third incident, he emailed a coworker stating, "I think they are going to terminate me . . . f---ing goddamn PRF at [store # 28] on Friday. OMG what am I gonna do?!" (Docket No. 14-2, 42.) Later that day, Croy acknowledged his mistake to Perpetua in an email stating, "No questions . . . I screwed it up. I am just at a lost at [sic] my mind the past few weeks. Too much going on I guess and too much distraction. . . . I am sorry to let you and the department down like this, but I view it as a temporarily distracted and worried time in my life that will not be repeated." (Docket No. 14-2, 36.)

BRB has a "three strikes" policy, which recommends termination of an employee who has three formal disciplinary write-ups within a ninety day period. Following Croy's third write-up, on April 13, 2011, Perpetua, Jackson, and Rick Postle, BRB's owner, reviewed Croy's case and decided to terminate his employment. BRB claims this decision was made solely in light of Croy's work performance. It also claims that no one at BRB knew Croy was HIV positive until he informed them of a positive diagnosis immediately following his termination.

**II.    Discussion**

4

A.  **Standard of Review**

Under Rule 56 of the Federal Rules of Civil Procedure, an award of summary judgment can be granted only when the moving party shows that there is no genuine issue of any material fact. Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). To survive summary judgment, the non-moving party must present evidence enabling a reasonable jury to return a verdict for that party. Id. at 252.

B.  **ADA Violation**

Croy alleges that BRB illegally fired him because he is HIV positive, in violation of the ADA. He also alleges that BRB violated the ADA by failing to provide him with a reasonable accommodation in the form of a reduced work schedule.

i.  **Discriminatory Discharge**

In evaluating claims under the ADA that do not involve direct evidence of discrimination, the court applies the McDonnell Douglas burden shifting scheme established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 57-58 (4th Cir. 1995) (extending the McDonnell Douglas burden shifting scheme to ADA cases). Under this approach, the plaintiff must first establish a prima facie case of discrimination. Id. at 58. If the plaintiff can successfully satisfy the elements of his claim, the burden shifts to the employer to articulate a legitimate, non discriminatory reason for the termination. Id. If the employer produces sufficient evidence on this point, the burden returns to the plaintiff to show why the employer's asserted justification is pretext for discrimination. Id.

To establish a prima facie case for wrongful termination because of a disability, the plaintiff must show that: (1) he was in the protected class, that is, he was disabled; (2) he was discharged; (3) at the time of the discharge, he was performing his job at a level that met his employer's reasonable expectations; and (4) he was terminated under circumstances that give rise to a reasonable inference of unlawful discrimination. Id. BRB argues that Croy was not performing his job adequately, and that in any event, he cannot establish that he was fired under circumstances creating an inference of discrimination because BRB was unaware of his disability.[1]

### a. Job Performance

BRB argues that Croy had a long history of poor communication that culminated in the three write-ups in the spring of 2011. In support of this, BRB points to the written disciplinary charges Croy received in 2009, as well as numerous other instances where Croy failed to submit accurate PRFs during his tenure with the company. BRB contends that Croy's write-ups in March and April of 2011 were the final straw in an ongoing issue with the plaintiff's job performance.

The court is not persuaded by the defendant's argument and believes that Croy has adduced sufficient evidence showing he was meeting BRB's legitimate expectations at the time he was fired. Although "[i]t is the perception of the decision maker which is relevant" in assessing whether an employee was performing his duties adequately, Johnson v. Mechs. & Farmers Bank, 309 F. App'x 675, 683 (4th Cir. 2009) (quoting Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 2003)), an employee may show that he was meeting his employer's expectations

---

[1] BRB does not challenge the contention that Croy is disabled. HIV, even in non-symptomatic stages, is often considered disabling. Under the amendments of the ADA, a person with HIV can be limited in the major life activity of "functions of the immune system." 29 C.F.R. 1630.2(i)(1)(ii). See Bragdon v. Abbott, 524 U.S. 624, 637 (1998) ("In light of the immediacy with which the virus begins to damage the infected person's white blood cells and the severity of the disease, we hold [HIV] is an impairment from the moment of infection.").

6

with "evidence that the employer had previously given the employee positive performance reviews . . . ." Jones v. Calvert Group, Ltd., No. 06-2892, 2010 WL 5055790, at *6 (D. Md. Dec. 3, 2010) (citing King v. Rumsfeld, 328 F.3d 145, 149-50 (4th Cir.), cert. denied, 540 U.S. 1073 (2003)). While Croy admits to some performance errors during his nearly five-year tenure with BRB, he was never told he was in danger of losing his job until the March 28, 2011 write-up. His most recent performance review indicated that he was meeting expectations, and he had recently been told that he was doing an excellent job and would be receiving a substantial bonus in the coming year. The three PRF-related write-ups that occurred in March and April of 2011 are insufficient to preclude a finding that the plaintiff was satisfactorily performing his job before being terminated. By the defendant's own admission, Croy had made similar mistakes numerous times in the past and had never been formally disciplined. Additionally, Croy reports that a number of his co-workers, including his supervisors Jackson and Perpetua, also failed to properly submit PRFs and were not disciplined for their mistakes. The court believes that Croy has at least established a genuine question of fact as to whether he was meeting BRB's expectations. The plaintiff's burden at the prima facie stage is "not onerous[,]" Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 511 (4th Cir. 2006), and given Croy's generally positive performance during the course of his employment with BRB, and construing the evidence and all reasonable inferences in the light most favorable to the nonmoving party, the court believes that Croy has fulfilled his burden in establishing this element of his prima facie case.

### b. Discriminatory Inference

Croy must also establish that the circumstances of his termination give rise to an inference of discriminatory intent. The court believes that the proximity in time between his diagnosis and his termination suffices to satisfy this element. Croy was fired thirty-three days

after he first revealed his condition to his supervisors. In the context of retaliation cases, the Fourth Circuit has held that proximity in time can be sufficient to establish the necessary causal connection between an employee's protected activity and the adverse employment action. See Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004) ("We assume, without deciding, that . . . the employer's knowledge [of a protected activity] coupled with an adverse action taken at the first opportunity satisfies the casual connection element of the prima facie case."); Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989) (holding that termination shortly after protected activity satisfied causal connection element at prima facie stage); see also Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001) (time span of less than three months "is short enough to permit a jury to infer a causal connection"). A number of district courts from other circuits have reached similar results specifically in the context discriminatory discharge cases such as the matter currently before the court. See, e.g., Warshaw v. Concentra Health Servs., 719 F. Supp. 2d 484, 496 (E.D. Pa. 2010) ("As a general matter, a fact-finder could reasonably conclude that adverse actions suffered by an employee shortly after an employer learns of the disability are, in fact, based on the employer's belief that the employee is limited in a major life activity."). The court is satisfied that the very brief period of time between disclosure of Croy's illness and his termination establishes the causal connection needed to make out a prima facie case.

The court notes that it is not persuaded by BRB's argument that, because it was unaware of Croy's condition prior to his termination, it could not possibly have fired him as a result of the disability. See Estate of Hoffman v. Baltimore City Pub. Schs., 173 F.3d 424 (4th Cir. 1999) (unpublished table decision) ("An employer must be aware of an individual's disability for ADA liability to exist."); Brown v. Pension Boards, 488 F. Supp. 2d 395, 406 (S.D.N.Y. 2007) ("At

minimum, for there to be causation [for discriminatory discharge], the employer must have knowledge of the disability.").

The defendant points to Croy's text message to Jackson following his doctor's appointment on March 24, 2011, in which he indicated there had been "no conclusions" and that "no news is good news?!" as proof that BRB had no reason to think he had actually been diagnosed as HIV positive. Additionally, BRB notes Croy's statements that he could "work anytime anywhere" and was "in normal mode," as well as his answer on the disability form stating he had never been diagnosed with HIV.

There is no doubt that Croy appears to have been less than perfectly clear regarding his condition and diagnosis. However, the court cannot accept the defendant's position that it had no knowledge of his illness until after he was terminated. First, Croy has testified that he affirmatively told Jackson and Perpetua on March 17 that his diagnosis was confirmed. Although the defendant can dispute this version of events at trial, it cannot do so at summary judgment where the plaintiff's testimony must be credited. Moreover, it is undisputed that, at the very least, Croy told his supervisors of a preliminary diagnosis of HIV, as documented in the March 10, 2011 Facebook message he sent to Jackson. The court believes that Croy has put forth evidence which would allow a reasonable jury to conclude that BRB was aware of Croy's illness, and that it fired him shortly thereafter on account of his condition.

### c. Pretext

BRB's assertion that it fired Croy based on his three, formal write-ups in March and April of 2011 for failing to accurately submit PRFs satisfies its burden of production in establishing a legitimate business reason for the termination. Ennis, 53 F.3d at 58. The burden then shifts back to Croy to establish a genuine question whether BRB's asserted justification is

9

merely pretext for discrimination. Id. In so doing, Croy argues that BRB has been continuously dishonest about when it first learned of Croy's disability. As discussed above, BRB insists that it was unaware of his illness until after the termination, in spite of considerable evidence to the contrary. In Reeves v. Sanderson Plumbing Prods., Inc., the Supreme Court held that "mendacity may, together with the elements of the prima facie case, suffice to show intentional discrimination." 530 U.S. 133, 147 (2000). The Court explained, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation [for the termination] that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the fact finder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" Id. (citing Wright v. West, 505 U.S. 277, 296 (1992)). The Fourth Circuit has reached similar results in cases where the employer has offered false or inconsistent justifications for the employment decision. Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 647 (4th Cir. 2002) ("The fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pretext."); E.E.O.C. v. Sears Roebuck and Co., 243 F.3d 846, 852-53 (4th Cir. 2001) (holding that, under Reeves, "the fact that Sears has offered different justifications at different times for its failure to hire Santana is, in and of itself, probative of pretext").

Although the defendant's alleged mendacity in this case comes in a slightly different context—it arises from the employer's insistence that it had no knowledge of the plaintiff's condition, an insistence plainly at odds with the plaintiff's version of events, rather than in the form of shifting or inconsistent explanations for the adverse action—the court believes it is still probative of the defendant's true motivation in firing the plaintiff, and can be utilized to advance

the plaintiff's showing of pretext. Given Perpetua's and Jackson's close involvement in the termination process, legitimate questions about their truthfulness in denying knowledge of Croy's condition weighs on their credibility in putting forth a legitimate business reason for the termination.

Croy also argues other BRB workers, including his supervisors, often had issues completing PRFs, and yet they were never formally disciplined for these issues. He asserts that such varied treatment indicates pretext. See Dotson v. Pfizer, Inc., 558 F.3d 284, 297 (4th Cir. 2009) (finding that uneven discipline for the same infraction is one way to show pretext). Moreover, BRB's evidence that Croy had a history of submitting incorrect PRFs, behavior which had not previously led to formal discipline, only serves to indicate that BRB's asserted justification is pretext. It was only after BRB learned that Croy was HIV positive did his PRF mistakes warrant discipline and ultimately termination.

In sum, Croy has satisfied his burden in raising a genuine question as to whether BRB's asserted justification was pretext for discrimination. The court believes that BRB has been, at the very least, disingenuous in its insistence that it was unaware of Croy's condition. Additionally, Croy has offered evidence which would allow a jury to conclude that he was treated differently from other employees who made similar mistakes, and that these mistakes increased dramatically in significance after he informed his employers that he was HIV positive. Accordingly, the court finds that the plaintiff has adduced sufficient evidence to survive summary judgment on his ADA discriminatory discharge claim, and will deny the defendant's motion on this point.

      ii.      **Reasonable Accommodation**

Croy also argues that BRB failed to provide him with a reasonable accommodation, in violation of the ADA. To support a reasonable accommodation claim, a plaintiff must show that (1) he was disabled; (2) his employer had notice of his disability; (3) he could perform the essential functions of his position with reasonable accommodation; and (4) his employer refused to provide such accommodation. Rhoads v. FDIC, 257 F.3d 373, 387 (4th Cir. 2001).

On February 28, 2011, BRB granted Croy's request to work reduced hours. At this time, Croy was experiencing significant flu-like symptoms. He testified that he was suffering from acute HIV infection with symptoms of rash, blisters in his throat, and an extremely high fever. BRB paid Croy his full-rate during this period. BRB contends that on March 10, 2011, Croy stated that he could return to work full-time. However, on March 17, 2011, Croy requested that he be allowed to continue working a reduced schedule. He was told that he needed to either return to work full-time or begin using his vacation days. Croy contends that BRB violated the law when it refused to grant his request to continue working shorter hours.

BRB again argues that it had no notice of Croy's disability and therefore cannot be liable for failing to provide accommodation. The court has already addressed the evidence it considers sufficient to establish that BRB was on notice of Croy's condition.

Alternatively, even assuming notice, BRB argues that Croy never requested an accommodation beyond the initial ten days when he worked a reduced schedule.

The court believes that Croy has satisfied the elements of his reasonable accommodation claim. First, as addressed above, Croy has established that he notified BRB of his disability. Second, he requested an accommodation when he asked to be allowed to continue working an abbreviated schedule. Third, Croy has satisfied his burden in offering an accommodation that would allow him to continue to perform the essential functions of his job. A reasonable

12

accommodation may comprise "'job restructuring, part-time or modified work schedules,'" Wilson v. Dollar General Corp., No. 12-1573, ___F.3d ___, slip op. at 12 (4th Cir. May 17, 2013) (quoting 42 U.S.C. § 12111(9)(B)). In initially suggesting the accommodation, "[the] plaintiff need only show that an accommodation seems reasonable on its face . . . ." US Airways v. Barnett, 535 U.S. 391, 401 (2002) (internal quotation marks omitted). Once he has done so, the burden shifts to the employer to describe the essential functions of the employee's position and why that particular accommodation would cause the employer to suffer an undue hardship. Id. at 402.

The court believes that Croy's request was at least "reasonable on its face." Id. Croy was suffering from severe flu-like symptoms in the period prior to his inquiry, and his request to be able to work a slightly reduced schedule was not unreasonable. It is worth mentioning that Croy's position allowed him to frequently work from home, so it is unlikely that any unavailability on his part would have presented BRB with significant staffing issues. More to the point, BRB has simply failed to offer any explanation why the reduced work schedule would have precluded Croy from fulfilling the obligations of his position, or how it would have imposed an undue hardship upon the company. Indeed, BRB has argued that the plaintiff's PRF mistakes, the purported cause of his termination, were unrelated to his illness or any time he missed from work. Therefore, BRB has failed to show how the particular requirements of Croy's position were irreconcilable with his request to work reduced hours as he began the process of learning to cope with his illness.

Furthermore, the court is concerned that BRB's consideration of Croy's request was lacking. Once a request for an accommodation is made, employers are required "to engage in an interactive process to identify a reasonable accommodation." Dollar General Corp., slip op. at

16; see also 29 C.F.R. § 1630.2(o)(3) ("[employers must engage in] an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."). This process is initiated by a request from the employee, but "requires participation by both parties." Templeton v. Neodata Servs., Inc., 162 F.3d 617, 619 (10th Cir. 2004); see also Dargis v. Sheahan, 526 F.3d 981, 988 (7th Cir. 2008) ("When . . . the disabled worker has communicated his disability to his employer and asked for an accommodation so that he can continue working, the employer has the burden of exploring with the worker the possibility of a reasonable accommodation.") (internal quotation marks omitted). Although the court is mindful that "the interactive process 'is not an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position . . . ,'" Dollar General Corp., slip op. at 17, the record is devoid of any attempt by BRB to explain why Croy's proposed accommodation was unreasonable. BRB appears to have simply denied Croy's request without engaging in an effort to identify a reasonable accommodation that would reduce the workplace barrier while still allowing Croy to fulfill his essential job obligations. For these reasons, the court will deny the defendant's motion on the plaintiff's accommodation claim.

C.  **FMLA Violation**

Croy alleges that BRB violated the FMLA in three ways: (1) interference by failing to properly designate leave as FMLA leave; (2) interference by failing to inform him of his right to take leave; and (3) interference by terminating him in retaliation for the exercise of his rights.

i.  **Interference claims**

The FMLA guarantees eligible employees up to 12 weeks of paid or unpaid leave each year to recover from "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). To succeed on a claim for unlawful interference, an employee must prove that:

> (1) [he] was an eligible employee; (2) [his] employer was covered by the statute; (3) [he] was entitled to leave under the FMLA; (4) [he] gave [his] employer adequate notice of [his] intention to take leave; and (5) the employer denied [his] FMLA benefits to which [he] was entitled.

Rodriguez v. Smithfield Packing Co., 545 F. Supp. 2d 508, 516 (D. Md. 2008) (citing Edgar v. JAC Prods., Inc., 443 F.3d 501, 507 (6th Cir. 2006)). Interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from taking such leave." Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 142 (3d Cir. 2004) (citing 29 C.F.R. § 825.220(b)). Additionally, the plaintiff must demonstrate that he was prejudiced by the interference in some way. See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002) ("The employer is liable only for compensation and benefits lost 'by reason of the violation,' [and] for other monetary losses sustained 'as a direct result of the violation.'") (quoting 29 U.S.C. § 2617(a)(1)(A)(i)(I)).

The plaintiff's first FMLA claim is based on the ten days between February 28, 2011 and March 10, 2011 that he worked reduced hours. He asserts that the hours missed during this time should have been designated as FMLA leave. Dooming Croy's claim, however, is that he cannot point to any harm he suffered as a result of the failure to designate the time as FMLA leave. Croy was paid his full rate during the period he worked reduced hours, and he was not docked any leave time. Although employers are required to notify employees of their rights under the FMLA, they cannot be punished for offering benefits greater than what is required under the FMLA. See Campbell v. Verizon Virginia, Inc., 812 F. Supp 2d 748, 756 (E.D. Va. 2011), aff'd,

15

474 F. App'x 167 (4th Cir. 2012). "In adopting the FMLA, Congress explicitly provided that 'nothing in this Act . . . shall be construed to discourage employers from adopting . . . leave policies more generous than [those required] under this Act.'" Id. (quoting 29 U.S.C. § 2653)). Here, at least with respect to the first ten days, BRB did more than was required under the Act. It was legally entitled either to (1) mandate the leave be unpaid, or (2) force Croy to substitute accrued paid leave for unpaid FMLA leave, given proper notice.[2] Id. ("Had Verizon's policy been to provide the minimum standard required by the Act, all of Campbell's intermittent FMLA leave would have been unpaid. All Verizon did here was to pay Campbell for the time he was off—that does not amount to an interference with his FMLA rights."). As such, Croy cannot establish he was harmed by the fact that BRB did not designate his time off during the ten days as FMLA leave, and the defendant's motion on this claim must be granted.

In Croy's second FMLA claim, he argues that BRB violated his rights when he was told on March 17, 2011 that he must either return to work or begin taking vacation time. In its motion for summary judgment, BRB correctly contends that the FMLA expressly allows employers to require employees to substitute any of their accrued paid leave time for FMLA leave. 29 U.S.C. § 2612(d)(2). Thus, BRB argues, it did not violate the law when it ordered Croy to begin using accrued leave for any future missed work.

The flaw in BRB's argument, however, is that employers must promptly notify employees of their intent to substitute accrued leave for FMLA leave. Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 300 (4th Cir. 1998) ("[T]o designate employer-provided leave as FMLA leave an employer must 'promptly (within two business days absent extenuating circumstances) notify the employee that the paid leave is designated and will be counted as FMLA leave.'

---

[2] Employers may substitute an employee's accrued paid leave for unpaid FMLA leave time, but they must give notice when they intend to do so. 39 C.F.R. § 825.300(e) ("Failure to follow the notice requirements set forth in this section may constitute an interference with . . . the exercise of an employee's FMLA rights."); see also infra, at 16.

Therefore, although an employer has the option of requiring an employee to designate vacation or other leave as FMLA leave, that option is waived if the employer fails to give proper notice of its intentions.") (quoting 29 C.F.R. § 825.208(b)); Moticka v. Weck Closure Sys., 183 F. App'x 343, 347 n. 2 (4th Cir. 2006) (unpublished) ("It is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee.").

In this case, it does not appear that BRB informed Croy that any vacation time he took would be designated as protected leave under the FMLA. However, while this might ordinarily constitute actionable interference, Croy is again unable to show that he was prejudiced by BRB's actions. Croy did not actually miss any time after his request was denied, so he did not lose any compensation or suffer a reduction in his accrued leave time. As such, Croy has failed to show prejudice and his claim cannot survive. Anderson v. Discovery Communications, LLC, No. 11-2195, 2013 WL 1364345 (4th Cir. 2013) (unpublished table decision) (amended May 3, 2013) ("Here, the only injury Anderson alleged as a result of Discovery's alleged unlawful denial of her request for a reduced work schedule was that she was not permitted to work a reduced schedule. She does not claim that she lost any compensation or benefits, sustained other monetary loss, or suffered loss in employment status as a result of the purported interference. . . . As such, her interference claim must . . . fail.").

### ii. Retaliation claim

Croy's remaining FMLA claim fares better. He asserts that BRB terminated him in order to avoid any future obligations it might owe him under the Act. FMLA retaliation claims based on circumstantial evidence are evaluated under the McDonnell Douglas framework. Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 502 (4th Cir. 2001). To establish a prima facie case for

retaliation under the FMLA, Croy must prove that he engaged in protected activity, BRB took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity. Cline, 144 F.3d at 301. Croy requested intermittent FMLA leave when he asked that he be allowed to continue working a reduced schedule. Shortly thereafter, Croy was terminated. As discussed above, the temporal proximity between the protected activity and the adverse action is sufficient to establish a causal link. Price, 380 F.3d at 213. Likewise, the court has already determined that Croy has established a question of fact as to whether BRB's asserted justification for the termination was pretextual. See supra, at 9-11. Accordingly the court will deny the defendant's motion as to this portion of his FMLA claims.[3]

### D. ERISA Violation

Finally, Croy alleges that BRB terminated him in violation of his rights under ERISA. He claims that BRB discharged him for the purpose of denying him health insurance—a benefit protected by § 510 of the Act. Section 510 makes it unlawful to discharge an employee "for the purpose of interfering with the attainment of any right to which such participant may become entitled under [a benefits] plan." 29 U.S.C. § 1140. Although discriminatory discharge claims brought under ERISA are litigated under the same McDonnell Douglas scheme of proof as Croy's successful ADA and FMLA claims, Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 238 (4th Cir. 1991), Croy has failed to establish that BRB's actions were specifically motivated by a desire to deny him any benefits protected by ERISA.

To bring a successful ERISA claim, the plaintiff must demonstrate that the employer had the specific intent to interfere with the employee's benefits. Id. at 239. The court is

---

[3] The defendant's focus on the plaintiff's statement that his only evidence of retaliation is the fact of discharge misses the point. This statement merely illustrates that the plaintiff has no direct evidence of retaliation. The plaintiff's circumstantial case is largely the same as that which the court found sufficient to defeat summary judgment as to his ADA claims.

18

convinced that Croy has failed to show how the termination decision was related to a desire to avoid paying health or other benefits BRB would incur as a result of Croy's illness. Temporal proximity alone is insufficient in this regard because the plaintiff has offered no evidence suggesting that BRB was ever concerned about additional costs associated with Croy's condition.[4] The court will thus grant the defendant's motion to dismiss Croy's ERISA claim.

## III. Conclusion

For the reasons stated above, the court will deny the defendant's motion to dismiss each of the plaintiff's ADA claims. The court will grant the motion as to the plaintiff's two FMLA interference claims, but will deny the motion as to the remaining FMLA retaliation claim. Finally, the court will grant the motion as to the plaintiff's ERISA claim.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 15th day of July, 2013.

/s/ Glen Conrad
Chief United States District Judge

---

[4] Croy recounts a conversation with Jackson in which she expressed a concern that medications he would have to take to treat his HIV would often make him ill as evidence that BRB was concerned about future health benefits. However, nothing in this innocuous statement serves as a reasonable basis for suspicion that Jackson or anyone else at BRB was concerned with increased health costs. Rather, the statement seems to indicate a genuine concern for Croy's health.